# Locust Mountain Water Company, Plff. in Err., *v.* William H. Yorgey.

The parties to a written contract may alter or cancel it by parol; but the evidence on the subject must be clear, precise and indubitable.

*Held* that, upon the evidence, the question as to whether t₁ terms of a written contract, in reference to clearing certain wood land for the reservoir of a water company, were changed by parol so as to extend the time allowed for doing the work, was properly submitted to the jury.

Where, on the ground of failure of a contractor to complete work within the time called for by his contract, the party for whom the work was to be done employs another person to complete it, and thereafter the original contractor brings suit for payment for the entire work, claiming that the time for its completion had been duly extended—he will, if entitled to recover, be entitled to recover the contract price less the amount paid him and less the amount reasonably required to fulfill the terms of the contract—not necessarily the amount actually paid the party who completed the work—and less such damages, if any, as the defendant may have suffered from the plaintiff's careless and negligent performance of work under the contract.

(Argued April 10, 1888.   Decided May 7, 1888.)

July Term, 1887, No. 205, E. D., before GORDON, Ch. J., PAXSON, GREEN, CLARK, and WILLIAMS, JJ. Error to the Common Pleas of Columbia County to review a judgment in favor of plaintiff, in an action of debt upon contract, December Term, 1883, No. 71. Affirmed.

The contract in suit was created by the following letters:

Hazleton, Pa., August 7, 1882.

William H. Yorgey,
    Bear Gap, Northumberland County, Pa.

Dear Sir: The Locust Mt. Water Co. will accept your proposition for clearing the ground to be overflowed for their storage reservoir in Brush Valley, near John L. Kline's. The price to be paid you for the work completed is to be as you offer, *viz.*, $40 per acre of surface cleared. All the brush, small trees to be cut down, and with the old timber and logs within the

NOTE.—For the admission of parol evidence to show a supplement to a written agreement, see note to Woods v. Russell, 1 Sad. Rep. 41.

lines that will be given by the engineer of the water company, and together with the tops of the larger trees, to be burned on the ground. The large timber and all that will make logs 10 inches and over at the small end, to be cut into saw logs of suitable length and hauled to the outside of the lines of clearing. The burning is to be so arranged that the fire shall not spread outside of the lines of the clearing—any damage arising from such spreading of the fire outside of the clearing lines to be at your cost; the work to be begun within ten days from the date of this letter, and to be completed to the satisfaction and acceptance of the engineer of the company on or before the first day of November, 1882.

Payments will be made you on or about the 15th of each month on the estimate of the company's engineer as to the character and value of the amount of work done on the first of each month, reserving 10 per cent of such amount until the final estimate is made on the completion of the above work to the acceptance and satisfaction of the company's engineer, when the entire balance then due shall be paid you.

Yours Truly,<br>
·   ·   Thos. S. McNair, Eng. L. Mt. W. Co.

P. S. Please let me know at once whether you will accept the work on the within terms, which are I believe the same as we talked over and agreed upon at Kline's. You can go to work if you accept, at once.

Yours,<br>
·   T. S. McN.

Bear Gap, August 12, 1882.

Mr. Thomas S. McNair,

Dear Sir: Your letter received and contents noted to-day. I will accept of your contract at your figures, $40 per acre, and will start to work on Thursday the 17th; and I want to know if I must take the saw timber off before I burn the brush or whether I can leave the saw timber on until after it is burnt, for then I can get it off much handier; it will do the saw timber no injury, only make it black, for the brush are so thick that I can hardly get through before it is burnt. I want to put a shanty on the ground; and let me know if you will let

me get a couple of small logs sawed into boards for that pur-
pose.

Please answer this at once.

Yours,

(Signed) William H. Yorgey.

Bear Gap, Columbia County, Pa.


Hazleton, Pa., Aug. 14, 1882.

William H. Yorgey,

Bear Gap, Columbia County, Pa.

Dear Sir: Yours of 12th inst., accepting the contract for
clearing and burning, etc., the reservoir dam of the Locust
Mountain Water Co. in Brush Valley, as offered you in my let-
ter to you of the 7th inst., has been received. I do not suppose
it will make much difference as to whether the saw logs or the
timber for them is taken off before or after the ground has been
burned over. You can get logs, etc., from the ground, for your
shanty, and can have the privilege of building it outside of the
overflow line. Want you to begin as soon as possible.

Yours,

Thomas S. McNair,

Eng. L. Mt. W. Co.


The facts further appear from the following charge of the
court below, GREEN, P. J.:

This is an action of debt brought by William H. Yorgey
against the Locust Mountain Water Company, to recover a sum
of money claimed to be still due upon contract made between
these parties by correspondence between the plaintiff and
Thomas S. McNair, engineer in chief of the defendant, in the
year 1882. In that year letters passed between Yorgey and
McNair, resulting in an agreement that the former should clear
off some 25 or 26 acres of land, to be flooded for a reservoir. The
surveyor on behalf of the plaintiff, following lines pointed out by
Yorgey, makes the area 25 acres and 97 perches; the company's
draft in evidence, following a line staked out upon the ground,
makes the area some half acre less. By the terms of the con-
tract the plaintiff was to cut the timber on this tract, drag out-
side of the line the logs above 10 inches in diameter at the small
end, burn up the brush, and in short clear the land, finishing
the job by the first of November of that year, and was to receive

$40 per acre of surface cleared. There is some evidence that about 1 acre and ½ had been cleared by John L. Kline before Yorgey took the contract; Yorgey, of course, would not be entitled to pay for whatever portion of this land had been cleared by Kline.

The plaintiff claims and testifies that his written contract with the water company was subsequently changed; that the representation made to him in the first place was that the area of this reservoir was only 18 acres, that when he found that it was more he was dissatisfied, and that on the 18th of August (shortly after the date of the last letter, closing the contract) he had a conversation with McNair on the ground, in which he complained to McNair that, the surface being larger than he had supposed, he could not complete his contract in the time agreed upon, and that McNair then allowed him until the spring of the following year, 1883, instead of until the first of November, 1882.

This alleged change in the contract rests upon the testimony of the plaintiff alone, entirely uncorroborated. The rule of law is that the testimony which would justify a jury in coming to the conclusion that a written contract has been changed by a subsequent agreement not in writing must be clear, precise, indubitable; that it shall leave no doubt upon the mind. The unsupported testimony of the plaintiff himself would scarcely be sufficient, if undisputed, to establish the change claimed; but, if it is contradicted by the testimony of other witnesses, it is clearly insufficient to change the terms of a written contract; the law does not permit a man to wipe out his own contract by his own testimony alone, to puff away by a breath his solemn engagement in writing. McNair positively denies that there was any change made in the contract on the 18th of August; and two other witnesses (Lawell and Nesbit, who say that they were present at the conversation) testify that there was nothing at all said about extension of time for the completion of this contract from the first of November, 1882, to the following spring—three witnesses who contradict Yorgey; it is clear that under such testimony the jury would not be warranted in finding that the terms of the contract were changed on that day. Besides, you have Yorgey's letter, written on the 8th day of October, 1882, in which he asks McNair, or the water company, whether he may not put off until spring the

clearing or the burning of the brush; this points strongly to the conclusion that there had been no agreement prior to the date of that letter, by which he was to have until spring to complete his contract. McNair says that he did not answer by letter, but sent word that he could make no change in the written contract; and Church testifies that he communicated this verbal answer to the plaintiff. All this shows pretty clearly, as I think, that there was no change made in this contract on the 18th of August; and it certainly shows that there is no testimony here sufficient to justify the jury in finding that there was a change made on that day.

[There is, however, some testimony here which, we think, must be submitted to you, as to what took place subsequently to the 18th of August, about the 20th of October, at Kline's Hotel, between McNair and Yorgey, in the presence of two or three witnesses. Yorgey had been sent for by McNair, and met him by appointment. Yorgey alleges that he then received from McNair directions with regard to the manner of clearing, such as materially modified the written contract. It is a question of fact for you whether the conversation at that time would indicate such a change in the contract as would relieve the plaintiff from the obligation to finish his work by the first of November, 1882, as he had before engaged to do. You have, upon the part of the plaintiff, his own version of what took place at that interview, and the testimony of Kline and of George Beaver, who say that they were present. Yorgey says that he was directed by McNair to stop any further cutting and to go on and clear the dam, so that the company could put the water in; that he had before been burning the prop timber (timber below ten inches in diameter at the small end), but that now it was arranged that the company should have the prop timber, and that he must be careful thereafter not to burn it, as he had been doing, when he burned the brush. Kline says he heard McNair tell Yorgey to stop cutting, that he had better not chop any more, that they would put the water in the dam and in the spring would let it out, and then Yorgey could clear off the balance; on cross-examination, he testifies to substantially the same thing. Beaver testifies to an expression used by McNair, but his recollection otherwise is somewhat vague.] 4

On the part of the defendant, McNair does not deny that he directed Yorgey to stop chopping and to go on with burning the

brush and clearing the ground, making ready to put in the water before cold weather, so that frost should not affect the embankment of the dam; but he testifies that there was nothing further said with regard to the matter, nothing of any change in the contract, and that Fetterman was subsequently employed merely to help Yorgey, that is to hasten the completion of the work. Nesbit was present at this interview, but I do not remember that he relates the conversation that took place; the jury will recollect about that.

Of course the same rule applies to all this testimony with regard to the conversation on the 20th of October that I have already stated in reference to the conversation of the 18th of August. If there was any change in the terms of the written contract, it must be shown by clear and positive testimony, so as not to leave any doubt in the mind of the jury that there was a change and of what that change was. It is not necessary that the court should dwell at any greater length upon the evidence of what took place at Kline's; the jury must recollect it, as they are the judges of the facts, and from the evidence determine whether or not there was any change then made in this written contract. The contract was not completed on the first of November, 1882. The allegation on the part of the defendant is that Yorgey was continually urged by the engineers of the water company to push the work; that he did not finish in the time agreed upon, but nevertheless kept on until about the 23d of December, one of the choppers testifying that that was the last day that he worked. You have the testimony of Church as to his telling Yorgey to burn the brush and Yorgey's reply that he would not burn the brush until spring; you have also the evidence of the written notice of the 4th of January, 1883, served upon Yorgey, that he had not fulfilled the demands of his contract, and that he should no longer have anything to do with the work; and the testimony of McNair and of Davis that the work was subsequently finished by other hands, and their estimates of the cost. McNair says that they employed some men by the day, paying $19.50, and that afterward they gave the contract to finish the work of clearing the dam to Silas Davis, a witness who testified before you, for the sum of $450 in cash and the timber that might be got from the tract, Davis estimating the whole (cash and timber) at $800.

You will first determine what Yorgey's agreement was. Then, if you find that this agreement was not carried out by him, and that in consequence the water company took the job from him under the notice of the 4th of January, 1883, then the company had a right to go upon the land and to finish the job, and the right to charge Yorgey what it was worth, and it would become a question of fact for you to determine what was a reasonable price for doing the work that Yorgey left undone. The plaintiff claims that he was prevented by the company from finishing his job and claims the amount of money that would be coming to him on his contract, less what it would reasonably have cost to finish the work. There is not much difference between the plaintiff and the defendant, so far as that question is concerned.

On the part of the plaintiff, Yorgey himself says that all the cutting had been done, except one day's work for one man, and that he could have finished his contract for about $150 or $160. One of his choppers puts it at $175 and another at inside of $200; the cost of dragging out the logs is not included in this estimate, but only what it would cost to burn the brush and clear the land. As to what number of logs was left within the clearing, or what it would have cost to drag them out, we have very little evidence. Under the terms of the contract it was Yorgey's duty to get out the logs; and whatever that would have cost should be deducted from the amount due him upon his contract.

On the part of the defendant, Silas Davis says that he has been in the lumber business for quite a number of years; that he went upon the ground, examined it, and made a contract with the defendant to complete the job for $450 in cash and the timber that remained upon the land; and he estimates the whole price at $800, which is considerably larger than the estimate on the part of the plaintiff.

It is your duty to ascertain what it reasonably was worth to finish the job so that the work would be completely done as provided in the plaintiff's contract. If you should find under all the evidence in the cause that this contract was violated by Yorgey, then the defendant had a right to go upon the land, do the work, and charge Yorgey with whatever amount was necessary to complete the contract; the jury are not bound by what it actually did cost (the $450 and the value of the timber);

but they will ascertain from the evidence what it should have cost at a reasonable estimate of the cost. If the work had all been done by day's labor, that would have furnished a more satisfactory element of computation; but the work was given out by contract to a person who was the only bidder; and whether his bid represents the reasonable cost of doing this work, or whether the testimony on the part of the plaintiff shows more clearly what it would have cost, is a question of fact for you under the evidence. The plaintiff claims that he did not violate his contract; that the contract was changed; that he ful-filled its terms as changed; and that therefore he is entitled to the unpaid balance due him upon the contract, less what it would have cost to clear this land. This is correct, provided the facts are as the plaintiff claims them to be. If, on the other hand, the plaintiff violated his contract, he would be liable to the defendant for any damages occasioned by the breach. If you find that the plaintiff violated his contract, then did the de-fendant suffer any damage by reason of that violation? If he did, the plaintiff would be liable in this action for the amount of such damage.

[The defendant claims that, because the clearing of the dam was not finished by Yorgey, the water could not be put in during the winter of 1882-3; that, in consequence, the frost got in, weakening the foundations of the dam (the puddling) in such a way as to make the dam leaky and liable to break; and that, as the result of the action of frost, the dam did break in Septem-ber, 1883, when the water was let in. It is proved that when the water had risen nearly to the height of the overflow of the dam, the dam broke; the question arises whether there is here sufficient evidence to enable you to determine the cause of that break. You have the testimony of McNair and of Church that, in their opinion, the break resulted from the action of frost upon the puddling during the preceding winter; but whether this conclusion is based upon facts ascertained by them, or upon mere theory and conjecture, is for you. If you find that there are facts in the case sufficient to warrant you in coming to the conclusion that the break in this dam in September, 1883, was caused by the frost of the preceding winter, and that that was occasioned by reason of the failure of the plaintiff to complete his contract, then the plaintiff would become responsible for that damage. It is for you to determine whether the break was

really caused by the action of frost, or whether it might not have been caused by some other causes than the action of the frost— a thing probably very difficult to determine—whether other causes may not have intervened. The dam had never been filled with water before, and there is no evidence here that it was really in a sound and perfectly tight condition. This accident that happened in September may have resulted from the working of some animal or some subterranean stream or passage by which the water may have got in under the foundations of the dam, under the ditch that was dug and under the puddling, and then, when the water was put in, in September, its height produced such pressure upon the work that the foundation became undermined and gradually tore out the dam. These are mere theories; but I suppose it is as wise to have such theories upon the subject of the cause of the break as to have the theory that frost caused the break, when neither theory is supported by facts in evidence in the cause.]

It is for you to determine, as I have already said, whether this dam was broken in September, 1883, by reason of the action of frost during the preceding winter. If you should find that there is not sufficient evidence to warrant the conclusion that the break was the result of the plaintiff's negligence, then, of course, you would throw that consideration out of the case. There is no other damage alleged. That would leave the question of the amount that should be paid Yorgey under the terms of the contract, giving to the defendant the amount which the completion of the job was reasonably worth. The jury can make their own calculation with regard to that. If you allow 25 acres, at $40 an acre, that would make $1,000; if you allow for 26 acres, that would make $1,040; deducting the acre and a half already cleared ($60), you will have $940, under the supposition that there were only 25 acres in the piece; if 26 acres, then $40 more, or $980. Both sides agree that the amount already paid Yorgey is $275. The water company paid Davis $450, and paid before Davis was employed $19.50, making $744.50, which, deducted from $940, would leave $195.50, not taking into consideration the value of the timber which Davis got in addition to the $450.

If you take the plaintiff's area of the dam, at $40 an acre, and then give credit to the defendant for $275 and for the amount which the plaintiff claims the job could have been fin-

ished for ($150 to $200) and also for the expense of dragging out the logs, which does not seem to have been included in the estimate of the expense of completing the work from the point where the plaintiff left it, you will readily see that the two calculations are very far apart. If you allow the defendant (besides the $275) the amount paid to Davis, it will leave nothing for this plaintiff; if, on the other hand, you make allowance according to the plaintiff's calculation, it will leave a considerable amount due to Yorgey; it is a question of fact, which we leave for you to pass upon.

The plaintiff submitted the following point, *inter alia:*

2. That it is the duty of the jury, in ascertaining whether or not there was such a subsequent modification of the original agreement as to time of completion of the work as is claimed by plaintiff, to take into consideration the conversation in October in Kline's Hotel (as testified to by the plaintiff, Kline and Beaver), the conversation in December on the ground at the dam (as testified to by plaintiff, Mensch and Mowry), the contract of the water company with Fetterman for hauling the prop timber and his hauling of said props during November, December, January, and part of February, and the letter of the engineer of the water company (of the 4th of January, 1883), expressly recognizing the continuance of the contract.

*Ans.* It is the duty of the jury, inquiring whether there was a change in the contract, to take into consideration all the evidence in the cause—both that on the part of the plaintiff, and that on the part of the defendant.   6

The defendant submitted the following points, *inter alia:*

2. That the plaintiff's *narr.,* being in the common counts, is an affirmance of the written contract, as per letters of August 7, August 12 and August 14; and he cannot recover, except upon the fulfilment of all its conditions, stipulations, and requirements.

*Ans.* This point is negatived.   7

4. That, even if an extension of time for completion of the work was allowed, it did not in any respect change the other requirements—as to how the work was to be done, the estimates by the engineer, and the acceptance of the work by him; and the

plaintiff is bound to show that the work was performed to the satisfaction of the defendant's engineer and accepted by him; and the plaintiff having failed to do this, and the undisputed evidence being that the work was not done to the satisfaction of the company's engineer, the verdict of the jury should be for the defendant.

*Ans.* Under the facts in the case, this point is negatived. 7

3. That no authority has been shown in any person to change the terms of the written contract.

*Ans.* If there was any authority, it must have been by Mc-Nair; and that he had authority may be readily inferred from the evidence. This point is refused. 8

The jury rendered a verdict for the plaintiff, for $625.47, and judgment having been rendered thereon, defendant took this writ, assigning as error: (1–3) The admission of certain evidence on the part of the plaintiff; (4,5) the portion of charge in brackets; and (6–8) answers to points.

*John G. Freeze* and *Wm. A. Marr,* for plaintiff in error.—In the making of this contract there was no parol contemporaneous agreement or understanding between the parties—there was no inducement of any kind held out to Yorgey to procure execution of it—and there is no allegation even, that the contract was executed on the faith of any parol agreement. Without these, the parol evidence to alter the contract should not have gone to the jury. Callan v. Lukens, 89 Pa. 134, and Merkel's Appeal, 89 Pa. 340; Rowand v. Finney, 96 Pa. 196; Burger v. Dankel, 100 Pa. 113. See also Cullmans v. Lindsay, 114 Pa. 167, 6 Atl. 332; Jackson v. Payne, 114 Pa. 67, 6 Atl. 340, and Phillips v. Meily, 106 Pa. 536.

Time was of the very essence of this contract. The work was to begin "within ten days from the date of this letter, and to be completed to the satisfaction and acceptance of the engineer of the company on or before the first day of November, 1882."

The work here to be done differs from the cases in the books; as for the threshing of an entire crop of wheat and threshing only part of it (McMillan v. Malloy, 10 Neb. 228, 35 Am. Rep. 471, 4 N. W. 1004); contracting to deliver 1,000 bushels of corn, and delivering only 400 bushels (Bowker v. Hoyt, 18 Pick. 555); contracting to work for a year or the season or the like,

and leaving before the time specified (Britton v. Turner, 6 N. H. 481, 26 Am. Dec. 713); where the work that actually is done, is complete, finished.

Here what was done was only partially done—none of it was completed, trees cut but the ground not cleared, the brush not gathered nor burned. Payment did not work acceptance of or satisfaction with the work. It did not make the contract severable, but left Yorgey as he was under the contract, by which he, before he could be paid, must produce the final estimate and acceptance of the company's engineer.

In the latter part of the portion of the charge covered by the fifth assignment of error, the learned judge ventured entirely outside the record. There was not a particle of testimony as to any stream or any animal, nor any indication of the one or of the other. It was a gratuitous and unwarranted dragging into the case of matters not testified to nor even alleged. The court is just as much bound to submit a case according to the evidence, as the jury is to find a verdict according to the evidence; and it is clearly error for the court to suggest causes and circumstances and reasons for things, not only without testimony, but against what was sworn in the case. See Howard Exp. Co. v. Wile, 64 Pa. 201; Cunningham v. Smith, 70 Pa. 450; Evans v. Mengel, 1 Pa. St. 68; Haines v. Stouffer, 10 Pa. 363; Sartwell v. Wilcox, 20 Pa. 117; Bogle v. Kreitzer, 46 Pa. 465; National Oil Ref. Co. v. Bush, 88 Pa. 335; Elkins v. McKean, 79 Pa. 493; Cauffman v. Long, 82 Pa. 72; Raby v. Cell, 85 Pa. 80; Egbert v. Payne, 99 Pa. 239; Newbaker v. Alricks, 5 Watts, 183; Whitehall v. Wilson, 3 Penr. & W. 405, 24 Am. Dec. 326; Musselman v. East Brandywine & W. R. Co. 2 W. N. C. 105; Harrisburg Bank v. Forster, 8 Watts, 304; Parker v. Donaldson, 6 Watts & S. 132; Bisbing v. Third Nat. Bank, 93 Pa. 79, 39 Am. Rep. 726.

*L. E. Waller* and *E. R. Ikeler,* for defendant in error.—The rule that oral testimony may not be given to vary the terms of a written contract does not exclude proof of any distinct, subsequent oral agreement to rescind or modify any such written contract, grant, or disposition of property, provided such agreement is not invalid under the statute of frauds or otherwise. Reynolds, Ev. § 70, p. 97; Anson, Contr. 238; Stephen's Digest of Ev. 90; Taylor, Ev. 1044; Wharton, Ev. § 1017; Malone v. Dougherty, 79 Pa. 46; Quick v. Van Auken, 3 Pennyp. 469.

This court will not reverse for the exercise, by the trial judge, of his discretion in commenting upon the evidence, where the remarks were not made as instructions binding upon the jury, but where the matter was submitted to their judgment. Phelin v. Kenderdine, 20 Pa. 354.

PER CURIAM:

None of the assignments of error can be sustained. The case was fairly submitted, and the law well stated by the court below. That the parties to a written contract may alter or cancel it by parol has never been doubted by this court; and in this case, the evidence to prove the extension of the time for the completion of the work was abundant, as was also the proof of McNair's power to assent thereto.

The judgment is affirmed.